UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BLACK JAGUAR, WHITE
TIGER, FOUNDATION,
and EDUARDO SERIO,
    Plaintiffs,


    v.                                    CIVIL ACTION NO.
                                           18-10987-MLW

ANDREA TIFFANY and
DOES 1-20,
    Defendants.

**REPORT AND RECOMMENDATION RE:
PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AND TO
COMPEL ANDREA TIFFANY TO SIGN RETRACTION LETTER
(DOCKET ENTRY # 35)**

**December 3, 2019**

**BOWLER, U.S.M.J.**

Pending before this court is a motion to enforce a March

2019 settlement agreement ("March settlement agreement") filed

by plaintiff Black Jaguar, White Tiger, Foundation ("BJWT") and

plaintiff Eduardo Serio ("Serio") (collectively, "plaintiffs").

(Docket Entry # 35).  Defendant Andrea Tiffany ("defendant")

opposes the motion.  (Docket Entry # 44).  In accordance with

this court's August 1, 2019 Order, this court held an

evidentiary hearing on September 23, 2019.  Defendant's counsel,

David J. Murphy, Esq., as well as defendant testified at the

hearing.  (Docket Entry # 56).  As explained in the August 2019

Order, factual disputes warranted the evidentiary hearing

regarding whether defendant understood and agreed to the terms
of the March settlement agreement and whether she agreed her
signature was not required to make the agreement final at and
around the time her counsel emailed a March 14, 2019 retraction
letter ("March 14 retraction letter") (Docket Entry # 56, Ex. 8,
p. 2) (Docket Entry # 56, Ex. 9, p. 4) to plaintiffs' counsel.
At the end of the evidentiary hearing, this court took the
motion (Docket Entry # 35) under advisement.  The issue of
whether the parties agreed to a binding settlement agreement,
the terms of that agreement, as well as whether it included the
March 14 retraction letter and its publication are therefore
ripe for review.

## PROCEDURAL BACKGROUND

Plaintiffs filed this action in May 2018 alleging defendant
and unidentified individuals published numerous "false and
malicious statements of fact" about plaintiffs on "various
social media platforms."  (Docket Entry # 1).  Defendant's
alleged defamatory statements began after she donated two
"Savannah/serval cats" because she could no longer care for them
in her Boston apartment.  (Docket Entry # 1, ¶¶ 1, 6, 15).
Massachusetts law purportedly prohibits their possession.
(Docket Entry # 1, ¶ 1).  Regretting the decision, defendant
sought the return of her serval cats, purportedly "was told" she
needed to pay BJWT's medical and transportation costs, whereupon

she refused and began accusing plaintiffs' of "criminal
wrongdoing, fraud, animal abuse, and political bribery,"
according to the complaint.  (Docket Entry # 1, ¶¶ 1, 2).  Based
on diversity jurisdiction, they assert state law claims for
defamation and "tortious interference with actual and
prospective business relationships."  (Docket Entry # 1)
(capitalization and emphasis omitted).

### FACTUAL FINDINGS[1]

At a February 6, 2019 status conference, the possibility of
settlement arose.  After a recess to allow defendant to speak
with her counsel, the parties returned to the courtroom, at
which time plaintiffs' counsel suggested the terms of a
settlement reached by the parties be read into the record.[2]

---

[1]  The factual findings include testimony and exhibits from the
September 23 evidentiary hearing along with any additional
exhibits submitted in support of the motion and events taking
place at various conferences conducted by this court.  Testimony
from the evidentiary hearing is referenced as "Docket Entry #
55."
[2]  Defendant's counsel filed a general appearance as counsel for
defendant in September 2018 and thereafter a motion to withdraw
in December 2018.  (Docket Entry ## 10, 20).  Two days prior to
the status conference, this court allowed the motion to withdraw
as counsel.  The December 2018 motion explained that he "was
hired to attempt to settle this matter quickly" and, "[n]ow that
settlement discussions have ended without a resolution,
Defendant has decided to represent herself in this matter."
(Docket Entry # 20).  Also, two days before the status
conference, defendant's counsel filed a motion to make a limited
appearance to file an opposition to a pending motion to compel.
(Docket Entry # 27).  This court allowed the motion prior to the
status conference but noted at the conference that plaintiffs'
counsel did not have an opportunity to object to the limited

(Docket Entry # 48, pp. 8-9).   During the above-noted recess, defendant's counsel discussed the settlement's terms with his client, defendant, including limiting the publication of the retraction letter.   (Docket Entry # 55).   He informed defendant that she was agreeing that plaintiffs may publish the retraction letter publicly to any third party as opposed to only plaintiffs' sponsors or private parties.[3]   (Docket Entry # 55). During this recess, defendant's counsel was very careful to make sure that his client, defendant, was in agreement with the terms read into the record on February 6, and that defendant agreed to those terms.   (Docket Entry # 55).   Immediately before plaintiffs' counsel read the terms into the record, defendant asked if she must agree to the settlement terms "right now," to which this court responded: plaintiffs' counsel is "going to dictate the terms.   Then they will be reduced to writing . . . [a]nd then you will have the opportunity to review it with your counsel and sign."   (Docket Entry # 48, p. 14).   Plaintiffs'

---

appearance.   (Docket Entry # 48, pp. 2-3).   Defendant's counsel stated his purpose in court was to argue the pending motion to compel and to try to facilitate settlement negotiations. (Docket Entry # 48, p. 4).   Later during the status conference, this court allowed defendant's counsel's "limited appearance since we seem to be on track at the moment," i.e., with a settlement.   (Docket Entry # 48, p. 18).   Defendant's counsel therefore represented defendant regarding settlement.
[3]   The above finding is based on the substance and reasonable inferences of defendant's counsel's testimony and demeanor at the September 23 evidentiary hearing.

counsel then proceeded to read the terms of the settlement into the record, including a term requiring defendant to "execute a correction/retraction letter which [plaintiffs'] clients will be free to use to attempt to restore their reputation to the extent necessary." (Docket Entry # 48, pp. 14-15).

After reading various other terms into the record and taking another recess for defendant to speak with her counsel, the conference resumed, and three additional terms were read into the record.  Defendant then stated she understood all of the terms, including these additional terms.  (Docket Entry # 48, p. 19).  More specifically, when asked if she understood those terms "will be the substance of the agreement," the following exchange took place:

> Defendant: Yes.  I mean, there's a little detail that I think will get worked out later, but I understand.
>
> The Court: And what is that?
>
> Defendant: The letter and stuff like this.  I don't really understand what they're wanting with this.
>
> Defendant's Counsel: The details of the settlement will be worked out in a written Settlement Agreement . . .
>
> The Court: So do you understand all of the terms that have been set forth today?
>
> Defendant: Yes.  I would like to see them in writing though.  I'm not good verbally hearing things.  I need to visually see it.

(Docket Entry # 48, pp. 19-20).

On February 11, 2019, a few days after the February 6
hearing, plaintiffs' counsel emailed defendant's counsel a
written draft agreement of the settlement setting out the
substance of the terms read into the record on February 6 along
with a draft retraction letter.  (Docket Entry # 56, Ex. 2).
Defendant's counsel then provided this written draft agreement
with the attached draft retraction letter to his client,
defendant, and reviewed them with her.  (Docket Entry # 55).
They went through multiple drafts and, in an email to
plaintiffs' counsel just over one week later on February 19,
defendant's counsel stated that he agreed that the February 11
written draft was "in accordance with the terms" that defendant
agreed to in open court on February 6, except for a few, mostly
stylistic changes.  (Docket Entry # 56, Ex. 3) (Docket Entry #
55).  Defendant's counsel attached the written draft agreement
to the email with a few redlined edits that he had yet to
discuss with his client.  (Docket Entry # 56, Ex. 3).  He did
not attach the draft retraction letter and reminded plaintiffs'
counsel that defendant and he (defendant's counsel) "would have
an opportunity to revise and edit" the retraction letter "in
order to reach a version that is mutually agreeable to all of
the parties."  (Docket Entry # 56, Ex. 3).  Notably, defendant's

counsel included defendant on this email.[4]  (Docket Entry # 56,
Ex. 3).

Paragraph five of the draft settlement agreement reduced to
writing the above-quoted provision read into the record on
February 6 that plaintiffs "will be free to use" the retraction
letter "to restore their reputation."  (Docket Entry # 48, p.
15).  Defendant's counsel added the word "public" in the
February 19 draft of the paragraph relative to a restriction
placed on defendant's ability to comment about the letter.
(Docket Entry # 56, Ex. 3).  Otherwise, paragraph five remained
the same in the February 19 draft as the one in the February 11
draft except for a slight difference in the heading.  (Docket
Entry # 56, Exs. 2, 3).  The February 19 attached draft of
paragraph five, with defendant's counsel's stylistic revisions
noted, read as follows:

### 5.  ~~Correction~~/Retraction Letter

Tiffany shall execute the letter attached hereto as
Exhibit B.  Tiffany agrees and understands that the BJWT
Parties may publish the letter in their sole discretion to
any third party and that publication of the letter shall
not constitute a violation of this Agreement.  Tiffany
further agrees that she will make no public comment about
the letter once it is signed.  She will not claim, suggest
or imply that she was coerced or pressured into signing the
letter and/or that her signature on the letter is
inauthentic.

---

[4]  During this time period, defendant made an Instagram post
stating, consistent with paragraph four, that she is not getting
her cats back, and, consistent with paragraph five, that she
cannot comment more on the matter.  (Docket Entry # 56, Ex. 15).

(Docket Entry # 56, Ex. 3).

In an email the following day to defendant's counsel,
plaintiffs' counsel proposed adding a sentence to paragraph five
clarifying the "'no public comment'" restriction placed on
defendant as including "statements on social media." (Docket
Entry # 56, Ex. 4).  Plaintiffs' counsel attached the February
19 draft with this added language in the February 20 email to
defendant's counsel.  Both plaintiffs' counsel and defendant's
counsel characterized this addition as "minor" and/or
"redundant" to the existing, agreed-upon substance of paragraph
five.[5]  (Docket Entry # 56, Ex. 4).  Defendant's counsel
forwarded this version to defendant, which he described as a
redlined version of the final settlement agreement excluding the
retraction letter ("February 20 agreement").  (Docket Entry #
55) (Docket Entry # 56, Ex. 4).  Drawing reasonable inferences,
defendant reviewed this version of the agreement and did not
object to its terms to her counsel, except for raising
objections to plaintiffs' publicity of the retraction letter and
its substance.

---

[5]  As indicated above, however, the parties had not arrived at a
final settlement at this juncture because of the outstanding,
material provision of the retraction letter's substance.   The
inclusion of the fourth sentence in paragraph five regarding the
restriction barring defendant from commenting about the
retraction letter on social media is not a material term to the
parties' agreement.

The next day (February 21, 2019) a dispute arose because defendant decided she no longer wanted to allow plaintiffs to publish the retraction letter on BJWT's internet site.  Instead, she wanted to limit plaintiffs' use of the letter to their sponsors and to individuals contacted privately.  (Docket Entry # 55).  Because this request was a substantive change to the agreed-upon terms allowing plaintiffs to freely use and publish the retraction letter, defendant's counsel expressed skepticism to his client that plaintiffs would agree to such a change. (Docket Entry # 55).  He nevertheless advised her that he would communicate her request to plaintiffs' counsel.  (Docket Entry # 55).  Upon doing so and as predicted, plaintiffs' counsel considered the change a deal-breaker.  (Docket Entry # 55). Defendant's counsel then informed defendant that plaintiffs were not willing to agree to her requested limitation to their use of the retraction letter.  (Docket Entry # 55).  He further advised her that if she would not agree to the terms as they stood previously and that she had agreed to in open court, then he could no longer represent her in this case.  (Docket Entry # 55).

On February 28, 2019, this court convened a second status conference at which defendant appeared pro se.  During the conference, defendant raised at length her dissatisfaction with the substance of the retraction letter and, to a lesser degree,

its publicity.[6]  (Docket Entry # 49, pp. 17-18).  Plaintiffs'
counsel also made clear that his clients would not settle the
case for no money without a retraction letter and without the
ability to publish the retraction letter online.[7]  (Docket Entry
# 49, p. 19).  In light of defendant's dissatisfaction with the
retraction letter, this court directed her to review and
underline any portion of the proposed retraction letter during a
recess.  (Docket Entry # 49, pp. 10-11).  Defendant complied
and, after resuming on the record, the parties proceeded to
review the modified retraction letter under this court's
supervision.  (Docket Entry # 49, p. 11).  After it became
apparent that the parties could not agree to the modified
version but that defendant remained willing to continue to
participate in the parties' attempts to resolve the matter, this
court gave defendant two weeks to write a retraction letter.
(Docket Entry # 49, p. 28).  In addition, this court set a
further hearing to determine if plaintiffs could "live with that
statement."  (Docket Entry # 49, p. 28).  This court also
directed plaintiffs' counsel to ask defendant's counsel if he

---

[6]  The draft retraction letter is the same as the draft attached
to the February 11, 2019 email.  (Docket Entry # 56, Ex. 2).
[7]  This is consistent with the substance of what defendant's
counsel advised defendant a few days prior, namely, that
plaintiffs were not likely to agree to limiting plaintiffs' use
of the retraction letter to plaintiffs' sponsors or anyone
plaintiffs contacted privately.  (Docket Entry # 55).

would represent defendant pro bono for the purpose of assisting defendant with the retraction letter. (Docket Entry # 49, pp. 28-29). Defendant's counsel testified that he received a call or an email from plaintiffs' counsel informing him of this court's request and that he agreed to represent defendant to try and help the parties reach a settlement, a somewhat broader undertaking. (Docket Entry # 55).

It now being early March, defendant's counsel and defendant focused their efforts on the retraction letter. He specifically recalled going back and forth with defendant through multiple drafts of the retraction letter until it became satisfactory to defendant in mid-March. (Docket Entry # 55).

Significantly, in an email dated March 14, 2019 and transmitted at 3:38 p.m., defendant's counsel wrote to defendant:

> Andrea, you did a really good job with this letter. I made a few minor edits, but I tried to keep almost all of what you wrote. I am hopeful that this will enable us to resolve this matter. Do I have your permission to forward the attached version of your Statement to Attorney Rich *for settlement*?

(Docket Entry # 56, Ex. 7) (emphasis added). The email attached the retraction letter with the minor edits. In a reply email one minute later, defendant responded, "Yes." (Docket Entry # 56, Ex. 7). Approximately two and one-half hours later, at 5:54

11

p.m., defendant's counsel sent a second email to defendant

stating:

> Just to confirm, I can send this letter to
> Attorney Rich?

(Docket Entry # 56, Ex. 8).  Again, defendant responded in a

reply email at 5:57 p.m., "Yes, please do."  (Docket Entry # 56,

Ex. 8).  Shortly thereafter at 6:11 p.m., defendant's counsel

sent an email to plaintiffs' counsel which reads, "Please see

the attached letter that [defendant] has agreed to sign.  I hope

that this will enable us to resolve this matter quickly."

(Docket Entry # 56, Ex. 9).  The email attached the March 14

retraction letter.[8]  The next day, plaintiffs accepted the offer.

Specifically, plaintiffs' counsel sent defendant's counsel an

email dated March 15 at 3:26 p.m. explicitly stating that the

March 14 retraction letter was "acceptable"[9] and he would have

---

[8]  The transmitted retraction letter was not signed; however, defendant's counsel testified that at some point defendant did sign the March 14 retraction letter (Docket Entry # 55) and defendant admitted during her testimony that she signed the settlement.  (Docket Entry # 55).  In addition, a March 18, 2019 email sent to defendant by her counsel, with both documents attached, states that defendant did in fact sign both the March 14 retraction letter and the final settlement agreement, i.e., the February 20 agreement without the redlined markings. (Docket Entry # 56, Ex. 14).
[9]  Plaintiffs' counsel noted the existence of a typographical error in the retraction letter, which defendant's counsel corrected in a reply email a few minutes later.  (Docket Entry # 56, Ex. 10).  Defendant's counsel attached the corrected retraction letter to the reply email.  (Docket Entry # 56, Ex. 10).

his clients sign the settlement agreement. (Docket Entry # 56, Ex. 10). Accordingly, at this point in time, plaintiffs accepted the above-noted offer by defendant and communicated that acceptance to defendant's counsel. (Docket Entry # 56, Ex. 10). Defendant's counsel's reply email at 3:33 p.m. the same day, March 15, thanked plaintiff's counsel for his "help in resolving this matter." (Docket Entry # 56, Ex. 10). Defendant's counsel testified there was absolutely no question in his mind that the parties reached a settlement at that point as set out in the previously agreed-upon February 20 agreement (without the minor redlined language) and the March 14 retraction letter. (Docket Entry # 55). The following Monday at 8:42 a.m. on March 18, plaintiffs' counsel emailed defendant's counsel an executed copy of the settlement for signature. (Docket Entry # 56, Ex. 12).

At some point after the above 8:42 a.m. email, defendant's counsel heard from defendant that she no longer wanted to proceed with the fully-negotiated settlement. (Docket Entry # 55). At 11:51 a.m. on Monday, March 18, defendant's counsel emailed defendant and pointed out that she "signed" the final documents, namely, the final settlement agreement and the March 14 retraction letter, and that there was "a deal" even on the

retraction letter.  (Docket Entry # 56, Ex. 14).[10]  He also

stated that if she did not want to go forward, they would need

to return to court, whereupon he asked her to advise him how she

wished to proceed.  (Docket Entry # 56, Ex. 14).  A few hours

later at 3:04 p.m., defendant emailed him a retraction letter.

(Docket Entry # 56, Ex. 13).  By Tuesday, March 19, it was

apparent she wanted to revise the retraction letter, which

defendant's counsel found troubling and problematic.  (Docket

Entry # 55).  Defendant's counsel testified that he had numerous

conversations with defendant throughout the settlement

negotiations whereby he communicated to her that oral

agreements, once made, are binding, and that plaintiffs will

seek to enforce them.  (Docket Entry # 55).  The email from

defendant's counsel to defendant on March 19 at 11:45 a.m. also

reminded defendant that agreements, once made, are binding

contracts.[11]  (Docket Entry # 56, Ex. 13).

---

[10]  The email refers to the retraction letter as defendant's
"statement," which this court finds is a reference to the March
14 retraction letter defendant's counsel emailed plaintiff's
counsel on Thursday, March 14, with defendant's express
approval.

[11]  In pertinent part, defendant's counsel wrote to defendant:

> I have read your latest revisions of your statement and I
> can tell you that they will absolutely be unacceptable to
> the other side.  When you sent me the draft that you
> signed, you knew that it would be posted publicly without
> restrictions, so we are on very weak ground to argue that
> you didn't know how the statement would be used.  As I have
> tried to impress on you, once you make an agreement with

At a status conference on March 21, 2019, defendant stated she "actually never agreed to settlement. I said I understood the terms you guys want me to sign on." (Docket Entry # 38, p. 5). When this court advised her that she had the benefit of counsel to explain the terms of the settlement and this court had asked if she understood those terms, defendant replied: "Understanding is different from agreeing, I guess. I don't know what else to say." (Docket Entry # 38, p. 6). Defendant then presented to this court and to plaintiffs' counsel a revised retraction letter ("revised retraction letter"). (Docket Entry # 38, p. 6).

Upon reviewing the revised retraction letter in open court, plaintiffs' counsel stated, "[T]his is materially different" and "my client is not going to accept this." (Docket Entry # 38, p. 7). After this court advised plaintiffs' counsel that he had "a duty to show it to [his] client," plaintiffs' counsel reiterated it "is not acceptable to my client," but stated he would share the revised retraction letter with his client. (Docket Entry # 38, p. 7). Plaintiffs' counsel further added that Massachusetts law "is pretty clear" and "[w]e think we have an agreement." (Docket Entry # 38, pp. 7-8). He also stated, "[defendant] sent

---

the other side, even an oral one, that is a binding contract.

(Docket Entry # 56, Ex. 13).

the offer saying this is what we agreed to sign, we accepted
when we said it is acceptable.  That's what a meeting of the
minds is."[12]  (Docket Entry # 38, p. 8).  In open court,
defendant signed the settlement agreement with the revised
retraction letter for plaintiffs' counsel to show his client.
(Docket Entry # 38, pp. 11-12).  In the event plaintiffs did not
accept the revised retraction letter, this court advised
defendant she would need to file an opposition to the motion to
enforce the settlement.  (Docket Entry # 38, p. 12).

     As forecast by plaintiffs' counsel, the revised retraction
letter was not acceptable to plaintiffs.  Defendant filed an
opposition to the motion to enforce on April 18, 2019.  (Docket
Entry # 44).  In pertinent part, she states in the opposition:
"Feeling my life is in danger has put undue pressure on me to
agree to a settlement."  (Docket Entry # 44, p. 1).  Defendant
alleges in her opposition that her counsel did not instruct her
to read the settlement, "only to sign it."  (Docket Entry # 44).
She also states that she did not give her "informed consent" to
the March settlement agreement and it is "void due to the lack
of contract."  (Docket Entry # 44, pp. 1, 8).  In other words,

---

[12]  Hence, by stating he would share the revised retraction
letter with his client, plaintiffs' counsel did not repudiate,
retract, or agree to modify the existing settlement with the
March 14 retraction letter.  (Docket Entry # 38, pp. 7-8)
(Docket Entry ## 35-4, 35-6).

she asserts the parties never came to an agreement.  (Docket Entry # 44, pp. 1, 8).  She also expressed the belief that "no documents would be made public."  (Docket Entry # 44, p. 1).

At the evidentiary hearing, while under oath, defendant read a statement she prepared into the record.  Her statement reaffirmed her current dissatisfaction with the settlement terms, the March 14 retraction letter, and her counsel.  (Docket Entry # 55).  She asserted she was subjected to undue pressure by her counsel to settle the case, that her counsel acknowledged that he knew she did not want to settle the case, and that he nevertheless pursued settlement anyway.  (Docket Entry # 55).  Defendant testified that "ineffective counsel" caused her to sign the settlement which she did not fully understand or to which she did not agree.  (Docket Entry # 55).  She also testified that her counsel repeatedly refused to follow her purported objective of getting her cats back.  (Docket Entry # 55).

This court considered defendant's testimony in its entirety in arriving at the factual findings in this opinion.  Her testimony was conflicting or contradictory at times.  These credibility issues led this court to discredit her testimony.  For example, at one point during her testimony, she stated that she agreed to allow attorney Murphy to pursue the "settlement route," but did so because she knew of no other legal mechanism

by which she might recover her cats.  (Docket Entry # 55).

Defendant also testified, however, that she did not agree to

enter into the settlement agreement, and, if she did, it was

because her counsel pressured her into it.  (Docket Entry # 55).

She testified that her counsel's withdrawal from the case prior

to the February 28 status conference evidences the fact that he

would only represent her if she agreed to settle the case.

(Docket Entry # 55).  Furthermore, she testified that she did

not knowingly give her consent to the settlement terms and did

not understand the meaning of those terms.  (Docket Entry # 55).

However, she previously confirmed her understanding of the

terms, which her counsel comprehensively explained to her.

(Docket Entry # 38, p. 6) (Docket Entry # 48, p. 19) (Docket

Entry # 55).

   She also voluntarily allowed and agreed that her counsel

could send the March 14 retraction letter to plaintiffs' counsel

to resolve the matter.  (Docket Entry # 56, Ex. 9).  On this

point, defendant insists she only agreed to transmit the March

14 retraction letter to plaintiffs' counsel because she thought

she added qualifying language to the March 14 retraction letter

which she believed prohibited plaintiffs from publishing it.

(Docket Entry # 55).  No such language appears in the

transmitted March 14 retraction letter.

While making her statement at the evidentiary hearing,
defendant attempted to downplay the import of the critical March
14 email exchange.  She testified to a concern that failure to
comply with her counsel's attempts at settlement would result in
argument with and further pressure by her counsel, and she
stated she did not have the energy to discuss the matter
further.  (Docket Entry # 55).  She therefore submits that these
reasons, and not her intent to be bound by the March 14
retraction letter, were the reasons she agreed to transmit that
retraction letter to plaintiffs' counsel for settlement.
(Docket Entry # 55).

DISCUSSION

A.   Contract Formation

Where, as here, diversity jurisdiction provides the basis
to adjudicate the claims (all of which arise under state law),
Massachusetts law governs the validity and the terms of the
purported settlement agreement.  See In re Volkswagen & Audi
Warranty Extension Litig., 692 F.3d 4, 15 (1st Cir. 2012) ("As a
general matter, 'interpreting settlement agreements and their
scope is a matter of state contract law'") (internal brackets
and citations omitted).  In fact, the purported settlement
agreement includes a provision that Massachusetts law applies.
(Docket Entry # 35-8, p. 10).

"The essential elements for the formation of a contract under Massachusetts law consist of an offer, acceptance, and consideration." Doe v. Trs. of Boston Coll., 892 F.3d 67, 89 (1st Cir. 2018). An offer occurs when "it manifests 'a willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'" Bosque v. Wells Fargo Bank, N.A., 762 F. Supp. 2d 342, 351 (D. Mass. 2011) (quoting Bourque v. Fed. Deposit Ins. Corp., 42 F.3d 704, 709 (1st Cir. 1994)). "During negotiations, '[a] substantial variation in contract terms incident to purported acceptance is not a binding acceptance but a counter offer,' while a 'comment, purported clarification, or expression of dissatisfaction appended to an endorsement of acceptance' is considered a full acceptance.'" Penney v. Deutsche Bank Nat'l Tr. Co., Civil Action No. 16-10482-ADB, 2017 WL 1015002, at *5 (D. Mass. Mar. 15, 2017) (internal quotations and citation omitted). Consideration is "a bargained-for exchange in which there is a legal detriment of the promisee or a corresponding benefit to the promisor." Neuhoff v. Marvin Lumber and Cedar Co., 370 F.3d 197, 201 (1st Cir. 2004). "'It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement.'" Lambert v.

Fleet Nat'l Bank, 865 N.E.2d 1091, 1095 (Mass. 2007) (citation omitted); see also Rosenfield v. United States Trust Co., 195 N.E. 323, 325 (Mass. 1935); LaPierre v. City of Lawrence, Civil Action No. 11-12039-RWZ, 2014 WL 4965008, at *1 (D. Mass. Oct. 1, 2014) ("[i]t is hornbook law that for an offer and acceptance to create a binding agreement there must be mutual assent" to agreement's terms), vacated and remanded on other grounds, 819 F.3d 558 (1st Cir. 2016).  Furthermore, "the determination of whether parties intended to be bound 'must be premised on the totality of all such expressions and deeds given the attendant circumstances and the objectives that the parties are attempting to attain.'"  Sinotau Pharm. Grp. v. Navidea Biopharmaceuticals, Inc., 211 F. Supp. 3d 375, 379-80 (D. Mass. 2016) (citations omitted).

To succeed on a motion to enforce a settlement agreement under Massachusetts law, the party seeking to enforce the agreement, here plaintiffs, bears the burden of "proving the existence of a contract." Moore v. La-Z-Boy, Inc., 639 F. Supp. 2d 136, 140 (D. Mass. 2009) (internal citation omitted).  "An enforceable agreement requires (1) terms sufficiently complete and definite, and (2) a present intent of the parties at the time of formation to be bound by those terms."  Targus Grp. Int'l, Inc. v. Sherman, 922 N.E.2d 841, 848 (Mass. App. Ct. 2010); accord Situation Mgmt. Sys., Inc. v. Malouf, Inc., 724

N.E.2d 699, 703 (Mass. 2000) ("to create an enforceable contract, there must be agreement between the parties on the material terms of the contract, and the parties must have a present intention to be bound by that agreement"). "Parties do not become contractually bound until they mutually assent to bind themselves to an agreement." Salem Laundry Co. v. New England Teamsters & Trucking Indus. Pension Fund, 829 F.2d 278, 280 (1st Cir. 1987); see also 1 Williston on Contracts § 18, at 32 (3d ed. 1954). Here, the dispute concerns whether there was a present intention by defendant to be bound by all material terms, including the March 14 retraction letter and paragraph five of the settlement agreement, which contemplated the creation and publication of the retraction letter. The dispute also involves whether defendant agreed her signature was not required to make the agreement final.

In Massachusetts, "[c]ourts determine [] mutual assent, not on the basis of what goes on inside the parties' heads, but rather on the basis of what they say and do." Salem Laundry Co., 829 F.2d at 280; see also TLT Constr. Corp v. RI, Inc., 484 F.3d 130, 136 (1st Cir. 2007) ("'[t]here is no surer way to find out what parties meant, than to see what they have done'") (quoting Pittsfield & N. Adams R.R. Corp. v. Bos. & Albany R.R. Co., 157 N.E. 611, 614 (Mass. 1927)). In other words, contract formation is an *objective* standard, the formation of which "'is

deemed to be what a reasonable man in the position of the other
party would conclude his objective manifestations to mean.'"
Greene v. Ablon, 794 F.3d 133, 147 (1st Cir. 2015) (quoting CSX
Transp. Inc. v. ABC & D Recycling, Inc., Civil Action No. 11-
30268-FDS, 2013 WL 3070770, at *5 (D. Mass. June 14, 2013)); see
also Mathewson Corp. v. Allied Marine Indus., Inc., 827 F.2d
850, 853 (1st Cir. 1987) ("'contracts depend on objective
manifestations of consent and not on uncommunicated subjective
expectations'") (quoting Bushkin Assocs., Inc. v. Raytheon Co.,
815 F.2d 142, 146 (1st Cir. 1987)).  To determine whether an
objective manifestation of mutual assent was made, this court
may look to the communications between the parties and evaluate
its effect.  See APB Realty, Inc. v. Georgia-Pacific LLC, Civil
Action No. 15-13142-LTS, 2019 WL 1047699, at *4 (Mar. 4, 2019),
appeal filed, No. 19-1311 (1st Cir. Apr. 1, 2019).  As explained
in APB Realty, "'A party's intent is deemed to be what a
reasonable man in the position of the other party would conclude
his objective manifestations to mean,' and may be inferred from
the party's conduct."  Id. (quoting Greene, 794 F.3d at 147).

Finally, even where the parties to an agreement contemplate
a written document, there can still be an enforceable agreement
before the document is executed.  See Quint v. A.E. Staley Mfg.
Co., 246 F.3d 11, 15 (1st Cir. 2001).  Alternatively, "[p]arties
can agree on every term in a contract, yet not be bound until

23

they sign a written agreement, if they so indicate." Salem
Laundry, 829 F.2d at 280.  Here again, the court in APB Realty
correctly articulates that:

> "[T]he parties' intention to execute a final written
> agreement justifies a strong inference that the parties do
> not intend to be bound until the agreement is executed."
> Situation Mgmt. Sys., 430 Mass. 875, 878 (2000) (internal
> quotation marks and citation omitted).  However, if the
> parties have reached agreement with regard to the material
> terms, "it may be inferred that the writing to be drafted
> and delivered is a mere memorial of the contract."  Id.

APB Realty, Inc., 2019 WL 1047699, at *4.  In Massachusetts,
"[t]he force of oral agreements 'made in open court and acted on
by the court,' . . . has long been recognized.'"  Correia v.
DeSimone, 614 N.E.2d 1014, 1016 (Mass. App. Ct. 1993).

For example, the two parties in Frishman v. Maginn, 912
N.E.2d 468 (Mass. App. Ct. 2009), "expected a final written
agreement, memorializing the terms of" an assignment of stock,
"as evident by the defendant's August 12, 1999, e-mail."  Id. at
475.  The court also noted that, "Despite the parties' numerous
conversations pertaining to the execution of the written
agreement, no document ever materialized."  Id.  "However,
various communications that took place—both oral and written—
signified the parties' intentions, as well as the specifics of
the assignment."  Id.  Inasmuch as "the three key" essential
elements of the parties' agreement existed, the court concluded

there was a binding contract notwithstanding the absence of a final, written and executed agreement.  Id. at 475-76.

B.  Analysis

Upon review of the communications between defendant and defendant's counsel, and the communications between defendant's counsel and plaintiffs' counsel, this court concludes that a binding agreement was formed on March 15, 2019, and that there is no dispute concerning the assent and present intent at the time of defendant to be bound by all material terms of that agreement.  Likewise, the objective manifestations and conduct establish that the parties intended that a final, signed agreement with the signed retraction letter attached was a mere formality to the agreement in substance of all the material terms that took place when plaintiffs accepted defendant's offer on March 15, 2019.[13]  The discussion that follows explains these conclusions.

At the status conference on February 6, the parties arrived at a preliminary settlement agreement.  As part of that agreement, defendant agreed to the creation and execution of a retraction letter which "[plaintiffs'] clients will be free to use to attempt to restore their reputation to the extent

---

[13]  In any event and in the alternative, this court finds that defendant signed the final settlement agreement and the March 14 retraction letter.

necessary."[14]  (Docket Entry # 48, p. 15).  Defendant was asked

by this court if she understood that the terms read into the

record during the status conference, including what would become

paragraph five of the agreement, would form the substantive

parts of the agreement.  She answered in the affirmative that

she understood.  (Docket Entry # 48, pp. 19-20).  Defendant did

take issue with the oral nature of the agreement, stating that

she needed to see all of the terms in writing (including the

language of the retraction letter) before she would agree to a

settlement.  (Docket Entry # 48, p. 20).  She was informed by

this court that the terms of the agreement would be reduced to

writing and she would "have the opportunity to review it with

[her] counsel."  (Docket Entry # 48, p. 14).  Thereafter,

however, she had ample opportunity to review (and did in fact

review) the February 11 written draft prepared and emailed by

plaintiffs' counsel between February 11 and February 19.

(Docket Entry # 55) (Docket Entry # 56, Ex. 3).  More

specifically, she reviewed the written language during that time

with her counsel and went through multiple drafts prior to the

February 19, 2019 email.  (Docket Entry # 55).  Drawing

---

[14]  The parties' agreement that defendant would execute a
retraction letter is not necessarily the same as an agreement
that the retraction letter required a signature to form a
binding settlement.  Further, as previously determined, this
court finds that, in fact, defendant signed the March 14
retraction letter.

reasonable inferences and based on the record, her counsel, with her consent, emailed the February 19 draft agreement to plaintiffs' counsel, which was sent to defendant via carbon copy. (Docket Entry # 56, Ex. 3).  On an objective basis, her conduct evidenced her agreement to the terms in the February 19 draft attached to the February 19, 2019 email sent at 4:02 p.m. (Docket Entry # 56, Ex. 3).  Plaintiffs' counsel then added the immaterial sentence to paragraph five, emailed a final version with the minor redlined changes, which defendant's counsel forwarded to defendant.

Next, she had ample opportunity to review and did review the February 20 agreement during the February 20 to March 14 time period.  This court also finds that she did not object to the material terms or the minor redlined language in the February 20 agreement to her counsel during this time period, except for the substance of the retraction letter and its publicity by plaintiffs.  The written language of paragraph five at this time, which defendant had and which this court finds she read and reviewed, states that she "agrees and understands that" plaintiffs "may publish the letter in their sole discretion to any third party . . . ."  (Docket Entry # 56, Ex. 3).  As of February 28, she knew and fully understood that any retraction letter would be used publicly by plaintiffs to restore their reputation online.  Her statements during the February 28

27

conference communicated her understanding that plaintiffs
required online publication of the retraction letter.  (Docket
Entry # 49, p. 17).  After the February 28 conference, she then
proceeded to work on a revised retraction letter with her
counsel until arriving at the acceptable version as of March 14.

In reaching the conclusion that the settlement agreement is
enforceable, this court relies on, inter alia, defendant's
counsel's February 19 email to plaintiffs' counsel, the February
20 emails, the March 14 emails between defendant and defendant's
counsel, as well as defendant's counsel's September 23 testimony
and his forthright demeanor on the witness stand.  Furthermore,
based on the emails and the conversations between defendant and
defendant's counsel, there is sufficient and, indeed, ample
evidence that defendant agreed to the March 14 retraction letter
in its form as of March 14 and that plaintiffs could publish
that letter.

Based on the totality of the attendant circumstances,
including the conduct of the parties and defendant's counsel
preceding mid-March, defendant made an offer to settle this
matter on March 14.  When defendant's counsel asked defendant
for her "permission to forward the attached version of [her]
Statement to [plaintiffs' counsel] for settlement" (Docket Entry
# 56, Ex. 7), he was asking her if he could make an offer to
plaintiffs for settlement inclusive of that retraction letter

and the terms of the prior written February 20 agreement. Based
on the facts found by this court, defendant previously agreed to
the terms in the February 19 draft and, between February 20 and
March 14, reviewed the redlined February 20 agreement without
objection. The latter document mirrors the February 19 draft in
all material respects. The surrounding circumstances also
included defendant's counsel's multiple and repeated
communications to defendant that oral agreements are binding
once made and that plaintiffs would seek to enforce them. The
email itself asked defendant's permission to send the statement
"for settlement," with the expressed hope "to resolve this
matter." (Docket Entry # 56, Ex. 7). Defendant then agreed to
the statement's transmission to plaintiffs' counsel "for
settlement" (Docket Entry ## 56, Ex. 8), which shortly
thereafter was transmitted by defendant's counsel to plaintiffs'
counsel.[15] At this point in time, when defendant replied "yes"
and her counsel communicated that to plaintiffs' counsel, there
was an offer to settle the matter consisting of the March 14
retraction letter and the February 20 agreement without the
minor redlined markings because a reasonable person in the

---

[15] As previously noted, defendant's counsel then wrote to
plaintiffs' counsel on March 14: "Please see the attached letter
that [defendant] has agreed to sign. I hope that this will
enable us to resolve this matter quickly." (Docket Entry # 56,
Ex. 12).

position of plaintiffs would have believed there was a
willingness by defendant to enter into a bargain.  See Bosque,
762 F. Supp. 2d at 351.

     The existence of an offer, of course, does not establish a
contract between the parties without an acceptance.  The
acceptance must not be "[a] substantial variation in contract
terms" otherwise it is in effect a rejection and a counteroffer.
See Penney, 2017 WL 1015002, at *5.  Here, the record
unequivocally shows that plaintiffs accepted the offer.
Plaintiffs' counsel communicated in an email dated March 15 at
3:26 p.m. that the settlement and the March 14 retraction letter
were acceptable but for one typographical error.  (Docket Entry
# 56, Ex. 10); see Penney, 2017 WL 1015002, at *5 (binding
acceptance exists even with "comment" or "purported
clarification[]").  Accordingly, at this point in time,
plaintiffs accepted the above-noted offer by defendant and
communicated that acceptance to defendant's counsel.  (Docket
Entry # 56, Ex. 12).  Because, as this court finds, there was an
offer, acceptance, and adequate consideration, the parties
entered into a binding settlement agreement.  Thereafter,
plaintiffs' counsel transmitted to defendant's counsel an
executed copy of the settlement, including the March 14
retraction letter, via email on March 18 at 8:42 a.m.

Defendant's assertions of coercion and undue pressure are not convincing.  She had ample opportunity to review all of the terms of the settlement, see them in writing, review and discuss them with her counsel, and revise them until they arrived at acceptable language.  Her counsel then communicated these revisions in the February 19 email to plaintiffs' counsel with a copy to her attention and also transmitted the redlined February 20 agreement to her.  When she subsequently objected to the internet publication of the retraction letter, her attorney again worked with her to arrive at the agreed-upon retraction letter as of March 14.  Throughout, she had the time and the benefit of an experienced attorney.  Moreover, her counsel explained to her on a number of occasions that an oral agreement, once made, is binding.  Defendant's counsel stated in the March 19 email: "As I have tried to impress on you, once you make an agreement with the other side, even an oral one, that is a binding contract."  (Docket Entry # 56, Ex. 13).  It is true that this statement was made to defendant after plaintiffs' counsel received and accepted the offer from defendant; however, its phrasing indicates that defendant's counsel explained these principles to defendant previously.  In fact, defendant's counsel testified that he had numerous conversations with defendant regarding the same during settlement negotiations. (Docket Entry # 55).  This statement to defendant also tends to

prove that defendant previously understood her signature was not
required to form a binding contract.

Additionally, to ensure that she realized that by sending
the retraction letter to plaintiffs for review she was making an
offer to enter into a settlement, her counsel asked her not
once, but twice, whether he had her permission to send the
retraction letter to plaintiffs' counsel.  Both times he asked,
defendant responded in the affirmative.  (Docket Entry ## 56,
Exs. 7-8).  While under oath and while reflecting on that email
exchange with defendant, defendant's counsel convincingly and,
in this court's observation, sincerely testified there was no
question in his mind that the parties entered into a settlement
on March 15.  When asked whether there was any question in his
mind that as of March 15th at 3:33 p.m. the matter between the
parties to the litigation had been resolved as memorialized in
the previously agreed-upon February 20 agreement[16] and the
retraction letter sent to plaintiffs' counsel on March 14,
defendant's counsel responded that there was absolutely no
question in his mind that the parties had reached a settlement
at that point, and that the parties were in agreement.

---

[16]  Defendant's counsel described the redlined February 20
agreement as the redlined version of the final agreement.
(Docket Entry # 55).

His answer is corroborated by the March 14 email sent to
plaintiffs' counsel immediately after defendant agreed to send
the March 14 retraction letter to plaintiffs' counsel.
Defendant's counsel wrote: "Please see the attached letter that
[defendant] has agreed to sign.  I hope that this will enable us
to resolve this matter quickly."  (Docket Entry # 56, Ex. 12).
Upon receiving the March 14 email from defendant's counsel,
plaintiffs' counsel reasonably concluded there was an objective
manifestation of intent by defendant to be bound by the March 14
retraction letter and the February 20 agreement, which
defendant's counsel stated he would forward to his client.
(Docket Entry # 56, Ex. 4).  See Greene, 794 F.3d at 147
("Massachusetts law requires objective, not subjective, intent")
(internal citation omitted); Bourque, 42 F.3d at 708 (offer is
"'manifestation of willingness to enter into a bargain, so made
as to justify another person in understanding'" his assent
"'*will conclude it*'") (quoting Restatement (Second) of Contracts
§ 24 at 71 (1981)) (emphasis in original).

In sum, there was a settlement consisting of the February
20 agreement (Docket Entry # 56, Ex. 4) without the redlined
markings and the March 14 retraction letter.  The parties agreed
that signatures were a mere formality and, in any event,
defendant and plaintiffs each signed the final agreement and
defendant signed the March 14 retraction letter.

CONCLUSION

In accordance with the foregoing discussion, plaintiffs' motion to enforce the settlement agreement (Docket Entry # 35) is **ALLOWED**.  Plaintiffs shall provide defendant with a clean copy of the final settlement agreement with an attached copy of the March 14 retraction letter, and she is directed to sign that agreement and the attached retraction letter.

/s/ Marianne B. Bowler_____
**MARIANNE B. BOWLER**
United States Magistrate Judge